103 So.2d 592 (1958)
James D. MILLER
v.
B. LEWIS CONTRACTORS, INC., and Liberty Mutual Insurance Company.
No. 4619.
Court of Appeal of Louisiana, First Circuit.
May 26, 1958.
Rehearing Denied June 30, 1958.
Edward K. Alexander, DeQuincy, for appellant.
King, Anderson & Swift, Lawes, Cavanaugh, Hickman & Brame, Lake Charles, for appellee.
LOTTINGER, Judge.
This is a suit for personal injuries resulting to petitioner, James D. Miller, while working on a job with his employer. The defendants are B. Lewis Contractors, Inc. and its liability insurer, Liberty Mutual Insurance Company. The Lower Court rendered a judgment in favor of defendants dismissing the action and the petitioner has appealed.
The Lower Court correctly found the facts to be as follows:
The petitioner herein, James D. Miller, was working for Baker R. Littlefield, hereinafter called "Littlefield," who was doing business under the name "Power Rig Drilling Company." Littlefield entered into a contract with Sunray Mid-Continent Oil Company to drill an oil well in the Parish of Beauregard, Louisiana. The contract was not only for the actual drilling of the well, but was also for the preparatory work, such as erection of the derrick, digging of the pits and such other work necessary in preparing the site for the drilling and completion *593 of the well. This preparatory work is commonly referred to in the oil field trade as "rigging up."
Petitioner was employed by Littlefield as a "rough neck," which term means a laborer who does the hard general work in the rigging up and drilling of the well. Line Babineaux was the "tool pusher" on the job, which means that he was the boss.
In rigging up for the drilling of the well, it was necessary for Littlefield to arrange for the services of a dragline and its crew, as he did not own a dragline nor did he have any employees who were skilled in the operation of a dragline. Arrangements were therefore made with defendant, B. Lewis Contractors, Inc., under which defendant was to supply a dragline together with its crew consisting of an operator and an oiler for the sum of Fourteen ($14) Dollars per hour for the time worked. Other than this, no contract was entered into between Littlefield and Lewis, however, similar arrangements had been made between the parties on previous jobs.
At about 9 o'clock on the morning of February 28, 1956 the tool pusher told Leonce Carrier, the operator of the dragline, to move a pipe rack from its location on one side of a derrick floor to the other side. It appears from the evidence that the pipe rack was a rather heavy piece of equipment. This operation necessitated the tying of the loose end of the dragline cable to the pipe rack, lifting it over or around a section of the derrick which was on its side and was propped up by means of "jacks." At the time, the petitioner and another employee of Littlefield were on the section of the derrick connecting the sections of the derrick together. Babineaux, who was the tool pusher, expressed the opinion to Carrier that he doubted that the dragline could move the pipe rack over the derrick, and that the dragline should be moved so as to enable it to move the rack around the end of the derrick. Carrier, however, thought that the rack could be successfully moved over the derrick, and, as he was an expert dragline operator, Babineaux agreed. In attempting to raise the rack over the derrick, the pipe rack struck one of the jacks supporting the section of the derrick on which Miller was standing, and the derrick fell to the ground. As a result of the fall, the petitioner was injured and the section of the derrick was practically demolished.
Petitioner brought this suit against defendant claiming that it was an independent contractor and therefore liable for damages caused by the negligence of its dragline operator, Carrier. Mutual Liability Insurance Company was made a defendant by virtue of its insurance contract with Lewis.
Travelers Insurance Company, the workmen's compensation insurer of Littlefield, intervened in this action claiming a refund of the unemployment compensation benefits paid petitioner as well as medical expenses, in the event a judgment should be awarded in favor of petitioner.
The defendants filed answer claiming (1) that Carrier was a borrowed servant of Littlefield, and was therefore a co-employee of petitioner, which, of course would mean that the only recovery for the injuries to petitioner would be under the workmen's compensation law; (2) that petitioner was guilty of contributory negligence which would bar his recovery from damages.
The first question to be answered is whether or not the dragline operator was the employee, pro hac vice, of Littlefield in the operations during which the accident occurred. If he was, then, under the fellow servant doctrine, the only relief of petitioner would be against Littlefield under the Employers' Liability or Workmen's Compensation Act. LSA-R.S. 23:1021 et seq. Furthermore, the claim of Travelers Insurance Company would then be denied because it was the Workmen's Compensation Insurer of Littlefield.
Paragraph 4 of petitioner's petition alleges that "* * * defendant, B. Lewis *594 Contractors, Inc., was engaged in the work as an independent sub-contractor * * * that the work which the said B. Lewis Contractors, Inc. had contracted to do for the said Baker Littlefield was to erect a derrick and put it up, and dig reserve pits and mud pits; that, in performing the said work, the said defendant, B. Lewis Contractors, Inc., employed a dragline, and a crew consisting of a dragline operator and an oiler."
These allegations, however, are not substantiated by the evidence, as was correctly found by the Lower Court. Furthermore, a determination of this issue is of fundamental importance in this suit, because to answer the first question presented above, we must first determine whether Lewis was an independent contractor.
We feel that the evidence conclusively shows that the dragline, as well as the operator and oiler, were used on this job for work incident to the rigging up process. The work done was Littlefield's work, and not Lewis' work. Littlefield's tool pusher was in complete charge of the rigging up process, and told the dragline operator what to do and when to do it. It is true that the dragline operator was not told which lever to pull at a certain time, but we must consider that the operator was a skilled laborer. We feel sure that the tool pusher did not tell his own direct employees which wrench to use to tighten a nut, or such other minute details which might be left to the discretion of the employee.
The record shows that, while the tool pusher could not discharge the dragline operator from Lewis' employment, he could cause him to be run off the job. This is shown by Babineaux's testimony to the effect that had Carrier refused to carry out his orders, he would have "run him off" the job. It appears that the dragline crew became an integral part of Littlefield's crew in the rigging up process. Although their portion of the work only involved the dragline operation, they were ordered what to do and when to do it.
The testimony reveals that the dragline and crew were hired for no specific job other than to help in the rigging up operation. They were to do whatever Babineaux told them to do. The job was that of Littlefield and not that of Lewis. Lewis was not present on the job, and he exercised no control over the dragline or crew insofar as this job was concerned. Even had he been present, he would have been subject to be told what to do and when to do it by Babineaux. Lewis' agreement was not to furnish the completed job. He rented the dragline and crew to Littlefield on an hourly basis to do whatever work, in their line, Littlefield or his tool pusher directed them to do.
The petitioner has cited the cases of Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 254, 53 L.Ed. 480 and Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137 in support of his contention that the dragline operator was not a borrowed servant of Littlefield at the time of the accident. In the Anderson case, Anderson brought an action to recover damages for personal injuries alleged to have been suffered by him through the negligence of a servant of Standard Oil Co. The plaintiff was employed as a longshoreman by one Torrence, a master stevedore, who, under contract with the defendant, was engaged in loading the ship Susquehanna with oil. The plaintiff was working in the hold, where, without fault on his part, he was struck and injured by a draft or load of cases containing oil, which was unexpectedly lowered. All the work of loading was done by employees of the stevedore, except the operation of the winch, which was done by a winchman in the general employ of the defendant. The question presented was whether the winchman, at the time the injuries were received, was the servant of the defendant or of the stevedore. The winchman was hired and paid by the defendant, who alone had the right to discharge him. The stevedore agreed to pay the defendant $1.50 a thousand for the hoisting. The stevedore had *595 no control over the movements and conduct of the winchman, except the hours of labor of the winchman necessarily conformed to the hours of labor of the longshoreman. The Court held that the winchman, at the time of the accident, was engaged in the work of the defendant under its rightful control. For reasons satisfactory to it the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum, and the winchman were its own (defendants). It did not furnish them but, furnished the work they did to the stevedore. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control. In that case, the Supreme Court said:
"It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." (Italics ours)
We do not feel that the facts of the Anderson case are controlling in the present case. In the present case, the dragline and its crew were doing the work of Littlefield and were under the direction and control of Littlefield's tool pusher.
In the Benoit case, [219 La. 380, 53 So. 2d 140] the petitioners were employees of Morris & Meredith, Inc., an oil well drilling company, they sued for injuries received when a fuel tank exploded through the negligence of an employee who was a welder in the general employ of Hunt Tool Company. Hunt Tool Company was engaged in the welding business and rendered welding service away from its place of business. It had in its employ several skilled welders, and furnished them as well as the equipment and materials for which they charged on an hourly basis. Hunt Tool Company was engaged in a contract with Morris & Meredith for the welding services. In that case, the Louisiana Supreme Court stated as follows:
"It is a well settled principle of law that the master is liable for the torts of his servant committed in the scope and course of his employment, but it is often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant or employee pro hac vice. In determining liability under this doctrine in some cases the courts have imposed *596 liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular work in question, the servant has been lent and is performing only the borrower's work, and that he was not the defendant's servant at all. It has been said that even the control test is not an infallible one, and that the elements of each case must be taken into consideration. Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant's business, the result is certain.
"Some courts follow the so called `whose business' test; others the `control' test. According to the Supreme Court of the United States these two tests are really one and the same, and determining who controls the servant is merely a means of determining in whose business the servant is engaged. Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Denton v. Yazoo & Mississippi Valley Railroad Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310; see Brown, Lent Servant Doctrine, Insurance Law Journal of 1949, pp. 343-350; Note, 44 Harv.L.Rev. 1136." See also B. & G. Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369; Spanja v. Thibodaux Boiler Works, Inc., La.App., 37 So.2d 615, 33 So.2d 146; Duke v. Dixie Bldg. Material Co., Inc., La.App., 23 So.2d 822.
We again believe that that case is distinguishable from the present one. Hunt Tool Company was under a contract to do welding for Morris & Meredith and at the time of the accident was performing their own work which consisted of their welding service under the contract with Morris & Meredith. It matters not that under the contract they were paid on an hourly basis.
In 35 Am.Jur. Master and Servant, Section 18, p. 455, we find the following discussion relative to a borrowed servant:
"One who has the status of general servant or employee may be lent or hired by his master to another for some special service so as to become, as to that service, the servant of such third person, the test being whether, in the particular service which he is engaged to perform, he continues to be under the direction and control of his master or becomes subject to that of the person to whom he has been lent or hired. Where an employee, with his consent, has thus been lent by his general employer to another person, he is deemed to have become, for all purposes of the relationship of master and servant, the employee of the borrower. For the time being, he is subject to the borrower's control and direction. However, the conclusion as to his status is the same regardless of the showing as to whether the person to whom he has been lent actually exercises his right of control or direction as to the details of the work, or simply sets the servant to do what is necessary, trusting to his expert skill for the result.
"To establish the fact that the servant of one has transferred his services to another pro hac vice, it must appear that he has assented, expressly or impliedly, to such transfer. No one can transfer the services of his servant to another master without the servant's consent. It must further appear that *597 the servant has, in fact, entered upon the service and submitted himself to the direction and control of the new master. His assent may be established by direct proof that he agreed to accept the new master, and to submit himself to his control, or by indirect proof of circumstances justifying the inference of such assent. Such evidence may be strong enough to justify a court in removing the question from the jury, or it may be required to be submitted to the jury."
In the case of Holland v. Marquette Casualty Company, La.App., 95 So.2d 878 we feel that we thoroughly went into the matter of a borrowed servant. Although the factual situation is not exactly similar to the one presently before us, we feel that the same principles of law would apply to the present case.
It appears to this Court that the case entitled B. & G. Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 is almost the same as the facts in the present case. In that case, a contract for the dismantling of a statue was given to defendant by the City of New Orleans. The work was to be done by the defendant and the defendant was to be responsible for the job. A verbal contract was entered into between defendant and petitioner whereby petitioner was to rent defendant a crane with operator and oiler for the price of $22.50 an hour. Damages were done to the statue during the dismantling proceedings and a suit was brought wherein it was necessary to determine whether the crane operator was a borrowed servant of the defendant. The Supreme Court held that the operation of the crane was under the control of the defendant and that the work being done at the time of the accident was the work of the defendant, and therefore held that the crane operator was the servant of the defendant under the borrowed servant doctrine. The same principles of law apply under the very similar factual situation of the present case.
Under the circumstances we feel that the Lower Court correctly held the dragline operator, Carrier, to be an employee, pro hac vice of Littlefield. He would, therefore, be a fellow employee of petitioner, and Lewis would not be liable in tort for the injuries to petitioner. Petitioner's sole remedy would be in Workmen's Compensation.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by petitioner.
Judgment Affirmed.